AO 106 (REV 4/10) Affidavit for Search Warrant                    AUSA Christine M. O'Neill, (312) 371-0762

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In the Matter of the Search of:                 Case Number:

Subject Phone 3, further described in Attachment A                 **20M286**

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Alison M. Teevan, a Task Force Officer of the Drug Enforcement Administration, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

**FILED**
6/8/2020
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

### See Attachment A

located in the Northern District of Illinois, there is now concealed:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is evidence and instrumentalities.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841 and 846 | narcotics |

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

_Alison M Teevan_ MDU signed with consent
*Applicant's Signature*

ALISON M. TEEVAN, Task Force Officer
Drug Enforcement Administration
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: June 8, 2020

_M. David Weisman_
*Judge's signature*

City and State: Chicago, Illinois

M. DAVID WEISMAN, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT     )
                                               )
NORTHERN DISTRICT OF ILLINOIS     )

## AFFIDAVIT

I, Alison M. Teevan, being duly sworn, state as follows:

1. I am a Task Force Officer with the Drug Enforcement Administration. I have been so employed since approximately November 2017. I am currently assigned to the DEA Chicago Field Division, and my responsibilities include the investigation of narcotics trafficking.

2. As part of my duties as a DEA Task Force Officer, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

3. I have received training in the area of narcotics investigations, money laundering, financial investigations and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4.     I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized there from, monetary instruments and various assets that were purchased with the proceeds of drug trafficking. I have participated in the execution of multiple federal search warrants.

5.     This affidavit is made in support of an application for a warrant to search a black LG Stylo 4 cellular telephone, bearing an unknown serial number ("**Subject Phone 1**"), a black Samsung cellular telephone, bearing IMEI number 352695107183874 ("**Subject Phone 2**") and a black Sonim XP8800 cellular telephone, bearing IMEI number 356512090110556 ("**Subject Phone 3**") (collectively, the "**Subject Phones**") for evidence and instrumentalities described further in Attachment B, concerning narcotics offenses, in violation of Title 21, United States Code, Sections 841 and 846.

6.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included

2

each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence and instrumentalities of violations of Title 21, United States Code, Section 846, are located within the **Subject Phones**.

## I.     FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT PHONES

7.     As explained below, on May 15, 2020, during the arrest of Arnulfo GARAY GARAY (GARAY), law enforcement recovered three cellular telephones – namely, a black LG Stylo 4 cellular telephone, bearing an unknown serial number ("**Subject Phone 1**"), a black Samsung cellular telephone, bearing IMEI number 352695107183874 ("**Subject Phone 2**") and a black Sonim XP8800 cellular telephone, bearing IMEI number 356512090110556 ("**Subject Phone 3**") (collectively, the "**Subject Phones**")

8.     Because the **Subject Phones** were found in GARAY's possession on May 15, 2020, shortly after his last known use of a telephone in furtherance of a narcotics offense, because there were multiple phone communications between GARAY and a Confidential Source, and because in my experience individuals engaged in narcotics trafficking often use telephones to contact coconspirators, there is probable cause to believe the **Subject Phones**, described further in Attachment A, contain evidence of violations of narcotics offenses.

A.    **GARAY's Narcotics Transaction**

9.    Since May 2020, a DEA Confidential Source (CS)[1], at the direction of law enforcement, has been in negotiations with a Mexico-based narcotics trafficker (UM1) regarding the transportation of fentanyl to Chicago, Illinois. In early May 2020, UM1 informed the CS[2] that UM1 was orchestrating the transportation of multiple kilograms of fentanyl to the Chicago, Illinois area at a date to be determined.

10.    On or about May 13, 2020, at approximately 1:25 p.m., UM1, using a Mexican telephone number ending in 9237, stated that UM1's associate was in possession of multiple kilograms of fentanyl.[3]  UM1 and the CS then negotiated the

---

[1] The CS has one prior arrest in 1998 for possession of a controlled substance and has worked as a source with DEA at various times since then. He was activated as a DEA source most recently on April 17, 2020. The CS is currently providing intelligence to and working with the DEA for the purposes of monetary gain. Since being reactivated he has been paid approximately $15,000.

[2] Unless otherwise noted, all phone conversations between the CS and UM1 are audio recorded. All times are approximate.

[3] Some of the consensually recorded conversations (hereinafter "recorded conversations") have been summarized in this Affidavit.  The language that is quoted from the recorded conversations throughout this Affidavit is based upon a preliminary review of the recorded conversations, and not on final transcripts of the recorded conversations.  The times listed for the recorded conversations are approximate.  The summaries do not include all statements or topics covered during the course of the recorded conversations.  At various points in the Affidavit I have included in brackets my interpretation of words and phrases used in the recorded conversations.  My interpretations are based on information received from the CS, the contents and context of the recorded conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.  Some of the recorded conversations contained herein are in the Spanish language.  For these conversations, I have relied on draft – not final – English translations of conversations in Spanish done by DEA agents and/or interpreters contracted by DEA.

future purchase of five kilograms of fentanyl, and that UM1 would have his associate deliver the kilograms to the CS.

11.     On or about May 14, 2020, the CS and UM1 had at least 20 additional conversations during which they discussed the price per kilogram of fentanyl and the location where the CS's purchase would take place. During one of these calls, at approximately 11:46 a.m., the CS and UM1, using a Mexican telephone number ending in 6892, had a conversation during which an unknown subject asked UM1 in the background how many kilograms the CS needed, and UM1 responded, "cinco [five]." The unknown subject then repeated the amount. Based on my training and experience, I believe UM1 and the unknown subject in Mexico were clarifying the amount and dictating the delivery of five kilograms, which indicates additional kilograms may have been available for delivery.

12.     At approximately 4:36 p.m., UM1, using a Mexican telephone number ending in 9237, sent a text message to the CS supplying the CS with a phone number, (331) 220-9221. In both a subsequent phone call and text message, UM1 stated the number belonged to UM1's associate who was currently in possession of the kilograms of fentanyl, and instructed the CS to call him later in the evening to coordinate the delivery.

13.     At approximately 6:24 p.m., the CS had a conversation with an individual later identified as Arnulfo GARAY[4], using telephone number (331) 220-

_____

[4] GARAY was positively identified at the time of his arrest on May 15, 2020, via his own personal admissions as well as his possession of an Illinois State Identification Card in the

5

9221. During this call, the CS asked GARAY where GARAY was located so that the CS could stay overnight closer to GARAY in anticipation of the narcotics transaction. GARAY stated that he lived in the area of Aurora/Oswego, Illinois. Furthermore, GARAY stated that he would not be able available until after 2:00 p.m. to conduct the transaction due to work commitments in Indiana. The CS offered to meet GARAY in Indiana the following day. GARAY refused because "the girls" (coded language for the 5 kilograms of fentanyl) were located closer to GARAY's home in the Aurora/Oswego area. During subsequent communications, the CS and GARAY agreed to meet the following day in Oswego, Illinois to conduct the transaction for five kilograms of fentanyl.

14.     On or about May 15, 2020, approximately 2:00 p.m., in anticipation of the transaction, law enforcement searched the CS and the CS's vehicle for contraband with negative results. The CS then traveled to the strip mall parking lot located at 1150 West Ogden Avenue in Montgomery, Illinois, under constant surveillance.

15.     At approximately 2:16 p.m., the CS had a conversation with GARAY, who was using telephone number (331) 220-9221. The CS informed GARAY that s/he was waiting for GARAY in the agreed-upon location. GARAY responded that he would be there in approximately 45 minutes.

---

name of Arnulfo GARAY GARAY. Law enforcement and the CS compared the voice on the consensually-recorded calls from telephone number (331) 220-9221 to the voice of the individual at the transaction on May 15, 2020, and determined the voices belong to the same person.

16.     At approximately 3:02 p.m., the CS had a conversation with GARAY, who was using telephone number (331) 220-9221. GARAY stated that he was close, at which point the CS advised GARAY to meet him in the strip mall parking lot located at 1150 West Ogden Avenue, in Montgomery, Illinois

17.     At approximately 3:20 p.m., law enforcement observed a red Dodge van (bearing IL temporary registration #184V621, registered to Arnulfo GARAY at 5408 State Route 71, Oswego, Illinois) arrive in the parking lot and stop directly next to the CS Vehicle.  Law enforcement then observed GARAY, the driver of the red Dodge van, have a conversation with the CS in the parking lot. During this conversation, the CS stood outside the CS Vehicle and spoke to GARAY through his open driver's window. This conversation was not recorded. According to the CS, GARAY stated that he needed to see proof that the CS had the money available and ready to purchase the narcotics.

18.     At approximately 3:30 p.m., the CS contacted an undercover officer (UC) who subsequently drove an undercover vehicle (UCV) into the parking lot and then parked next to the CS Vehicle and GARAY.  Law enforcement observed the CS and GARAY walk over to the UCV, at which point the UC showed GARAY a grey duffle bag containing five sham bundles of money. The UC then immediately left the area.

19.     After viewing the sham money, GARAY directed the CS to follow him back to GARAY's residence to retrieve the narcotics. Surveillance officers then followed the CS as the CS drove the CS Vehicle directly behind GARAY in the Dodge

van. From the meeting location, GARAY drove directly to the residence located at 5408 Route 71, in Oswego, Illinois. Upon arriving at the residence, GARAY and the CS each parked their vehicles in the driveway. They exited the vehicles and had a brief conversation.

20. At approximately 3:58 p.m., law enforcement, specifically aerial surveillance officers, observed GARAY enter the residence through the rear door. Approximately 5 to 10 minutes later, law enforcement observed GARAY exit the residence through the same door, now carrying a white bag, and approach the open trunk compartment of the CS Vehicle. Moments later, the CS gave a pre-determined arrest signal to law enforcement.

21. As a result, law enforcement approached the CS and GARAY, who were both standing near the open trunk of the CS Vehicle and placed GARAY under arrest. In plain view, in the open trunk compartment of the CS Vehicle, law enforcement observed a white plastic garbage bag. Inside the garage bag were five brick-shaped objects heavily wrapped in black electrical tape.

### B. The Subject Phones

22. Once in custody, law enforcement searched GARAY and recovered the **Subject Phones** and $3,523 from his pants pocket. GARAY then was released to further the investigation.

23. Since May 15, 2020, the above-described **Subject Phones** have been in the government's custody.

8

24.     At the time of arrest, data stored on **Subject Phones**, including text and voice mail messages sent and received by GARAY during the course of the commission of the narcotics offenses, were not known.

25.     Based upon my training and experience, I know that cellular phones may contain relevant evidence of narcotics offenses, including text messages made or received from the **Subject Phones** that are located in the memory of the **Subject Phones**, which messages may provide information regarding the identities of, and the methods and means of operation and communication used by, the participants in the threat and narcotics offenses. Moreover, digital photographs located in the memory of the **Subject Phones** may contain images of the tools or participants involved in the narcotics offenses. Moreover, digital photographs stored in the **Subject Phones** may contain images of the user of the **Subject Phones**, the user's associates (including persons involved in or knowledgeable about the subject offenses), places frequented by the user of the phone leading up to and during the subject offenses, and locations and instrumentalities used in committing the subject offenses.

26.     In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the

9

information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

27. Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data

10

contained within the cell phone, such data will remain stored within the cell phone indefinitely.

28.     Through experience as a law enforcement officer and through the experience of other law enforcement officers as conveyed to me, I have learned that individuals involved in criminal offenses, including conspiracies to possess and distribute narcotics, commonly use cellular telephones as a means to communicate. GARAY used a telephone to negotiate a narcotics offense on May 14 and May 15, 2020. Individuals involved in criminal offenses including conspiracies to possess and distribute narcotics, also often store telephone numbers and names or nicknames of fellow conspirators on their telephones and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones. Because, as explained above, the **Subject Phones** are associated with the target(s) in this case, because there was telephonic communication between participants involved in the threat and narcotics offenses, and because, in my experience and in the experience of other agents, defendants use telephones to contact co-conspirators, there is probable cause to believe the **Subject Phones**, described further in Attachment A, contain evidence of violations of threat and narcotics.

## II.     SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

29.     Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.     Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.     Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed

to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

30.     In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

31.     In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## III.     PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

32.     Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the **Subject Phones** described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

33. The review of electronically stored information and electronic storage media removed from the **Subject Phones** described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a. examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c. surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

14

34. The government will return any electronic storage media removed from the **Subject Phones** described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## IV.  CONCLUSION

35.    Based on the above information, I respectfully submit that there is probable cause to believe that threat and narcotics offenses, in violation of Title 21, United States Code, Sections 841 and 846, have been committed, and that evidence and instrumentalities relating to this criminal conduct, as further described in Attachment B, will be found in the **Subject Phones**, as further described in Attachment A. I therefore respectfully request that this Court issue a search warrant for the **Subject Phones** more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

FURTHER AFFIANT SAYETH NOT.

_____  MDO
                                    signed with consent
Alison Teevan
Task Force Officer
Drug Enforcement Administration

Sworn to and affirmed by telephone or other reliable electronic means, this 8th day of June, 2020

_____
Honorable M. DAVID WEISMAN
United States Magistrate Judge

16

## ATTACHMENT A

## DESCRIPTION OF ITEM TO BE SEARCHED

The cellular telephone identified as follows:

**Subject Phone 3**: black Sonim XP8800 cellular telephone, bearing IMEI number

356512090110556

## <u>ATTACHMENT B</u>

## LIST OF ITEMS TO BE SEIZED

Evidence and instrumentalities concerning violations of Title 21, United States Code, Sections 841 and 846, as follows:

1.     All records of telephone calls, text messages, SMS messages, picture messages, voicemails stored within the device, contact lists and phonebook, recent call activity, electronically formatted personal notes, photographic or video images, audio recordings, application data, browser history data, or records of appointments and/or reminders annotated on a calendar relating to the above-mentioned violations, or reflecting the identity of the user of the **Subject Phones**.

## ADDENDUM TO ATTACHMENT B

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol:

The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.   examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.   searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.   surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B; and

d.   opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

The government will return any electronic storage media removed from the premises described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

AO 93 (Rev. 11/13) Search and Seizure Warrant

AUSA Christine M. O'Neill, (312) 371-0762

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In the Matter of the Search of:

Subject Phone 3, further described in Attachment A

Case Number: **20M286**

## SEARCH AND SEIZURE WARRANT

To: Alison M. Teevan and any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of Illinois:

**See Attachment A**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

**See Attachment B**

**YOU ARE HEREBY COMMANDED** to execute this warrant on or before June 22, 2020 in the daytime (6:00 a.m. to 10:00 p.m.).

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the issuing United States Magistrate Judge.

Date and time issued: June 8, 2020    at 4:45 p.m.

_Judge's signature_

City and State: Chicago, Illinois

M. DAVID WEISMAN, U.S. Magistrate Judge
_Printed name and title_

AO 93 (Rev. 11/13)  Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No: | Date and Time Warrant Executed: | Copy of Warrant and Inventory Left With: |
| Inventory made in the presence of: | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|
|   I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br>  Date: _____<br><br><br>  _____<br>  *Executing officer's signature*<br><br>  _____<br>  *Printed name and title* |

## <u>ATTACHMENT A</u>

## DESCRIPTION OF ITEM TO BE SEARCHED

The cellular telephone identified as follows:

**Subject Phone 3**: black Sonim XP8800 cellular telephone, bearing IMEI number

356512090110556

## <u>ATTACHMENT B</u>

### LIST OF ITEMS TO BE SEIZED

Evidence and instrumentalities concerning violations of Title 21, United States Code, Sections 841 and 846, as follows:

1.      All records of telephone calls, text messages, SMS messages, picture messages, voicemails stored within the device, contact lists and phonebook, recent call activity, electronically formatted personal notes, photographic or video images, audio recordings, application data, browser history data, or records of appointments and/or reminders annotated on a calendar relating to the above-mentioned violations, or reflecting the identity of the user of the **Subject Phones**.

## ADDENDUM TO ATTACHMENT B

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol:

The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.      examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.      surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B; and

d.      opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

The government will return any electronic storage media removed from the premises described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.